**LAW OFFICE OF LAWRENCE SHEA**
Lawrence W. Shea, II (Bar No. 126976)
lshea@lawrenceshea.com
P.O. Box 6353
San Diego, California 92166
Telephone: (858) 263-1726

**CALLAHAN & BLAINE, APLC**
Edward Susolik (Bar No. 151081)
es@callahan-law.com
John D. Van Ackeren (Bar No. 240739)
jvanackeren@callahan-law.com
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA 92707
Phone: (714) 241-4444
Facsimile: (714) 241-4445

Attorneys for Plaintiff DORIAN HARGROVE

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DORIAN HARGROVE, an individual, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF SAN DIEGO, a Municipal Corporation; MARA ELLIOTT in her individual capacity and in her official capacity as City Attorney for the City of San Diego; JOHN HEMMERLING in his individual capacity and as Assistant City Attorney for the City of San Diego; and DOES 1 through 100, inclusive, <br><br> Defendants. | CASE NO. 3:21-cv-01491-CAB-WVG <br> Judge: Judge Cathy Ann Bencivengo <br><br> **DECLARATION OF PLAINTIFF DORIAN HARGROVE IN SUPPORT OF HIS OPPOSITION TO DEFENDANT CITY OF SAN DIEGO'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT [FRCP 12(B)(6)] AND SPECIAL MOTION TO STRIKE ALL CAUSES OF ACTION [ANTI-SLAPP / C.C.P. 425.16]** <br><br> Hearing Date: November 22, 2021 <br> Hearing Time: 10:30 a.m. <br> Courtroom: 1510 <br><br> Complaint Filed: August 23, 2021 <br> Trial Date: None Set |

I, Dorian Hargrove, declare as follows:

1. That I am the Plaintiff in the above-entitled action.

2. That I am a resident of the City of San Diego, forty-five years of age, and the married father of two children under 10 years of age.

3. That I have worked continuously as a journalist since 2007. I was hired by NBC7 San Diego in 2017 and was made Producer in 2018 and added to the Investigative News Team in 2018. I was assigned by NBC7 San Diego to the 101 Ash St. story in approximately February 2020.

4. As an investigative news reporter, I have concentrated on the subjects of public corruption and cover-ups most particularly involving the City of San Diego.

5. That during my career as an investigative journalist I have received the following illustrative professional accolades and awards relating to my reporting concerning corruption and cover-ups including at the City of San Diego:

　　a. **The National Academy of Television Arts & Sciences, Emmy Award, News Category (2019)**: *"Flood of Distrust: A Deep Dive Into San Diego's Water Department"* – NBC7 San Diego (November 4, 2018), revealing fraudulent water meter billing and concealment by the City of San Diego Water Department.

　　b. **Radio Television Digital News Association, Edward R. Murrow Award (2021):** *"STOLEN: A Year-Long Investigation Into Child Sex Trafficking & Exploitation"* – NBC7 San Diego (August 2020), investigation of human sex trafficking and child exploitation in San Diego County.

　　c. **Radio & Television News Association of Southern California, Golden Mic Award (2021):** *"STOLEN: A Year-Long Investigation Into Child Sex Trafficking & Exploitation"* – NBC7 San Diego (August 2020).

　　d. **San Diego Taxpayer's Association, Taxpayer Watchdog Award (2019):** *"Flood of Distrust: A Deep Dive Into San Diego's Water*

HARGROVE DECLARATION IN SUPPORT OF
OPPOSITION TO MOTION TO DISMISS

1 *Department"* – NBC7 San Diego (November 4, 2018).

2      6.     That I am an investigative news reporter working for NBC7 San Diego and am the primary investigative news reporter on the following articles written regarding 101 Ash Street: *Whistleblower Claims City Ignored Warnings About Asbestos and Fire Safety at Downtown High Rise – NBC7 San Diego (February 20, 2020); New Cracks Emerge On City Purchase of Former Sempra Building at 101 Ash Street – NBC7 San Diego (April 16, 2020); City Officials Knew 101 Ash St. Was Riddled With Asbestos – So Why Were Hazards Ignored? – NBC7 San Diego (July 23, 2020); City Failed To Conduct Basic Review of 101 Ash St. Property: Outside Review – NBC7 San Diego (July 29, 2020); City Official at Forefront of 101 Ash Purchase Resigns – NBC7 San Diego (August 5, 2020); No Good Options: Did Taxpayers Get Burned In 101 Ash Street Deal? – NBC7 San Diego (August 7, 2020); Fraud or Incompetence? Taxpayers Sue Over Botched $300 Million High Rise Deal – NBC7 San Diego (August 18, 2020); City Workers Moved Into 101 Ash Despite Concerns of Polluted Water, Failing Sewer Pipes, and Inoperable Fire Alarm – NBC7 San Diego (August 21, 2020); "101 Ash St. Investigation Looked At Whether City Staff, Former City Council Member Gloria Misled Public"* (September 3, 2020); *"NBC7 Retracting Story on Gloria and 101 Ash Street Investigation"* (September 21, 2020).

     7.     That upon being known in the community as an investigative reporter revealing public corruption, waste and cover-up in the City of San Diego regarding 101 Ash Street, I developed confidential sources with inside knowledge concerning the history of the transaction, the involvement of the City Attorney and others in that transaction and subsequent cover-up.

     8.     That a dispute arose with City Attorney, Defendant Mara Elliott ("Elliott"), concerning the story, *"101 Ash St. Investigation Looked At Whether City Staff, Former City Council Member Gloria Misled Public" (September 3, 2020),* in

which Elliott disputed the authenticity of a footnote 15 contained in a document provided by a confidential source, but not the substantive content of the report provided by the source nor the gravamen of the reporting that the City of San Diego had covered up the basis for the decision to flip from a purchase to a lease nor that Todd Gloria, then President of the City Council, who changed his vote on the matter, was never interviewed by the investigators. NBC7 elected to retract the story on the basis of the assertion by Elliott that the footnote was not authentic, which on the basis of the information available to the new department could not be refuted absent a legal investigation that was procedurally unavailable.

9. The subject footnote 15 read as follows:

> *15. One question is whether Ms. Thompson, Deputy COO Ron Villa, COO Scott Chadwick and a member of the City Council misrepresented the transaction to the public and other members of the City Council. According to an email from Mr. Villa on September 1, 2016, there was a belief that "we will not be able to achieve approval for a purchase at the $72m price" and "the fact remains that the general public and policy makers may not be able to get behind paying more for the building then (sic.) the 'appraised value.'" Apparently, on September 16, before the revised transaction was scheduled to be presented to a City Council Committee, Ms. Thompson and Mr. Villa met with Council President Todd Gloriq and two of his staff members for an "update" on the transaction; Mr. Gloria had previously been skeptical about the lease-to-own structure when it was used for a prior acquisition, but was supportive of the 101 Ash agreement.  The discussions during the update could be informative about why the City went forward with the transaction despite the unfavorable language in the Lease Agreement, the due diligence materials available to the City, and the substantially higher cost of the lease-to-own structure.  However, we were unable to obtain the City Attorney's approval to interview Mr. Gloria or his staff (all of whom are no longer in the employ of the City.)*

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

10. The substantive content of footnote 15 contained facts that were unknown and unknowable outside the City of San Diego at the time of its publication and which proved true in all respects. First, it has since proven true that these persons misrepresented the transaction to the City Council and the public. It is also true that an email from Ron Villa dated September 1, 2016, had been concealed by the City and by Elliott before the publication of this footnote which is accurately quoted in footnote 15. The existence of this email and its text was unknown and unknowable except by persons with access to the email and a detailed knowledge of the transaction. It is also true that Todd Gloria had been skeptical of the lease transaction, had been briefed by Real Estate Assets in an as yet undisclosed manner and thereafter switched his vote. It is also true that the switch to a lease resulted in a windfall profit that was divided by the sellers and 45% of those monies were surreptitiously paid to the City's own broker, Jason Hughes. These facts are known now but at the time of the footnote they were being concealed. Moreover, Todd Gloria was not and has not ever been interviewed by the investigators, whose involvement was critical, and no investigation can be complete without his version of these facts. It is also true that Elliott had exclusive control over the scope of the investigation and controlled all witnesses who were interviewed in fact demanding that any City witness to be interviewed had to be coordinated by her office and her lawyers had to be present during questioning. It is unknowable whether a specific request was made by the investigators for his interview, but it is a reasonable assumption that under these circumstances, assuming the investigation is legitimate, that his interview would be required.

11. That I am informed and believe that there were conversations between the City Attorney's representatives and NBC7 regarding my employment and demanding prior restraint against my reporting on the City of San Diego in the future. Further, I am aware that on or about September 11, 2020, there was a series

- 4 -

of emails and voice mail between Chuck Westerheide, who led the investigation of my employment for NBC7 San Diego, and Hillary Nemchik, who is and was at the time the spokesperson and media representative for the City Attorney's Office. Attached as Exhibit A to this declaration are emails produced by the City of San Diego which contain communications between Ms. Nemechek and Mr. Westerheide which I believe calendar a voice meeting to discuss my continued employment with NBC7 San Diego.

12. That I am informed and believe that there was a meeting attended between Mr. Westerheide and Gerry Braun, who is a non-lawyer working for the City of San Diego as the designated "Chief of Staff" for City Attorney, Elliott, on the subject of my employment restrictions at NBC7 San Diego.

13. That on or about September 11, 2020, Elliott on the official Twitter account of the City Attorney's Office caused the following Tweet to be posted in pertinent part:

> *Our Democracy is under attack from many directions, and reckless lies like this are designed to undermine public trust, San Diegans deserve to know the truth about who was behind this smear campaign, and how they got away with it for so long. […]*

[Tweet and attached statement sent by @CityAttorneySD September 11, 2020]

14. That this Tweet contained false statements of fact about me in the following particulars:

a. That the story I presented as reckless lies when in fact it was reasonable under the circumstances, was true and correct and was known to be true and correct by the Defendants, and was based on a detailed investigation including the input of a highly placed informant within the City of San Diego with a long career for veracity, who was within the control group of persons for the investigation with access to the report and all of its particulars, and who verified the

- 5 -

1 contents of the report and who provided emails validating the content of the footnote
2 that had been concealed from disclosure to the public by Elliott.

  b. That the story I presented was designed to undermine public trust when in fact it was for the purpose of revealing public corruption and concealment by Elliott and others at the City of San Diego and the extent of the financial losses to the City inherent in the 101 Ash transaction.

  c. That there was a smear campaign, that had been operating for an extended period of time when in fact, the only known purpose of the whistleblower informant and the articles was to disclose the extent of public corruption and concealment by Elliott and the City of San Diego. The clear inference is that I was a part of some nefarious campaign or a hapless contributor to it when the true facts were that I had been writing news stories that were uncovering public corruption with no political affiliation or purpose other than to serve as an investigative journalist.

  15. That on October 7, 2020, Elliott's campaign manager, Dan Rottenstreich, caused the following press release to be tweeted from the personal account of Elliott:

> *No one is going to intimidate Mara Elliott as she fights to*
> *protect taxpayers and clean up the 101 Ash Street mess*
> *she inherited.*
>
> *NBC7 suspended Dorian Hargrove after its internal*
> *investigation found he wrote a phony story based on a*
> *fabricated document. The only defamation was the false*
> *story itself, a wild and baseless smear orchestrated to*
> *swing an election.*
>
> *San Diegans still need to know who helped Hargrove write*
> *his story, and who sought to benefit politically or*
> *otherwise from the lies it spread about the City Attorney*
> *and Todd Gloria.*

- 6 -
HARGROVE DECLARATION IN SUPPORT OF
OPPOSITION TO MOTION TO DISMISS

[Tweet and attached statement sent by @MaraElliott October 7, 2020]

16. That this Tweet also contained false statements of fact against me in the following particulars:

    a. NBC7 did not suspend me because it found I wrote a phony story based on a fabricated document. I was suspended because of demands and threats directed toward NBC by Elliott as detailed herein. Moreover, there was never any factual determination that the story I filed was phony. In fact, it was truthful, has proven accurate in every particular and the accuracy of the story was known to Elliott at the time. There was also no evidence the document I was provided was fabricated. This document was compared by my source and I to the version1 relied upon by the City Attorney as the authentic version (omitting footnote 15 and three other footnotes) and it is identical word for word. In addition, version2 with the footnotes was reviewed by multiple forensic examiners who found no evidence it was a fabrication and brought significant physical attributes forward indicating version2 was likely prepared by a person inside the investigation control group with access to the original Word file. All of these facts were known by Elliott at the time her campaign manager published this false Tweet on her personal account.

    b. As with the previous Tweet on her Official Twitter account, the suggestion is false that I was part of a political smear campaign or that my purpose in filing this story was any different than the many other stories I had published concerning corruption at 101 Ash. I was not part of any political group affecting the election and did not knowingly or inadvertently participate in a political campaign to harm the election fortunes of Elliott or anyone else. As was known by Elliott at the time of this Tweet there was no factual basis for these assertions against me and in fact they were and are untrue.

    c. The Tweet suggests that there is a group of people who worked

- 7 -

HARGROVE DECLARATION IN SUPPORT OF
OPPOSITION TO MOTION TO DISMISS

with or through me to publish false information in order to change the outcome of the election. These facts are untrue and cast me in a bad light professionally. There is no group of people I am aware of who were using my reporting to injure the political aspirations of Elliott. I had a highly placed confidential source who had been confirming the information contained in the footnote and other aspects of the 101 Ash corruption and concealment all of which have proven to be accurate. The story at issue is not false. I believe that the footnote itself is accurate information and that Elliott has known this from the beginning. I also believe that the contents of the footnote with respect to Todd Gloria are in fact accurate in every particular with the limited exception of whether Elliott refused to allow him to be interviewed, which I believe based on all of the surrounding circumstances to also be true though it cannot be proven without Elliott's cooperation unless and until I have the benefit of civil discovery in this matter.

17. That after I returned to NBC in November 2020 after the election, I had a conversation with Chuck Westerheide in which he informed me that he had been having meetings and/or calls with representatives of the City Attorney's Office concerning my employment involving other representatives of Elliott in addition to Hillary Nemechek whom he refused to identify for me.

18. That in 2021, Chuck Westerheide was terminated by NBC7 following a formal complaint I presented concerning his treatment of me which is directly related to the subject matter of this lawsuit.

19. That on or about September 22, 2020, the following restrictions were placed upon me which prevented me from continuing to report on public corruption or cover up regarding the City of San Diego:

    a. Suspension pf employment for the remainder of the election cycle through November 9, 2020;

    b. Suspension of pay from September 18, 2020, through November

- 8 -
HARGROVE DECLARATION IN SUPPORT OF
OPPOSITION TO MOTION TO DISMISS

9, 2020;

   c. Prohibition of reporting of any kind either for NBC or any other media outlet, and including any reporting independently, concerning the City of San Diego, any City politician, any City policies, or any matters involving San Diego City Hall.

   d. Absolute prohibition against submission of any public records requests to the City of San Diego either on my personal behalf or NBC on any subject whatsoever.

  20. That based on my knowledge of the circumstances, the persons involved in the investigation policy making for NBC7 San Diego, including their personal relationships with persons in the City Attorney's Office, the conduct of the City Attorney relative to me including the threat of criminal prosecution I received in July 2020 that was only withdrawn after the San Diego community of journalists condemned it as a prior restraint, the additional threats of litigation and potential criminal involvement of the station if it did not take definitive action against me and cease all reporting concerning 101 Ash, and the nature of the restraints placed upon me which are uniquely tailored to prevent me from reporting on public corruption and suspend me entirely during the remainder of Elliott's election campaign, the fact I was made a public spectacle to discourage other journalists covering 101 Ash and to intimidate whistleblowers Elliott suspected were either from top City management with access to the original investigation reports or attorneys within the City Attorney's Office, I believe NBC7 was instructed and/or compelled to take the specific actions taken against me and to publicly retaliate against me by Elliott acting through her surrogates, which involvement can only be definitively determined with the investigative authority of civil discovery process.

  21. That as a result of the actions taken against me, I have suffered and will continue to suffer the following damages and categories of damages which I believe

are directly caused by the actions of the Defendants in this matter alleged in my Complaint, including Elliott:

      a. Past lost earnings for the period of my suspension;

      b. Past lost earning capacity in the form of lost opportunities for advancement and/or pay increases I would have otherwise received based on my performance;

      c. Future lost earnings and earning capacity due to the stigma and public ridicule instigated by the actions of the City Attorney, including without limitation the false assertion that the report at issue was inauthentic;

      d. Past medical expenses for psychological treatment due to extreme anxiety and medical and emotional distress which resulted in my complete disability from April 1, 2021, through September 21, 2021;

      e. Permanent damage to my reputation as an investigative news reporter which will affect my employability and earning capacity for the foreseeable future.

22. I believe and on that basis allege that all the news reports I filed concerning 101 Ash, including without limitation the report I filed that is at issue in this matter, were accurate and that my reporting in 2020 was the seminal reporting that has since uncovered the scandal that has consumed the City of San Diego. I believe that the discovery allowable in this matter will reveal that the footnote at issue was added as a draft of the subject report by a person within the City of San Diego with detailed knowledge of facts disclosed therein that were not known or knowable at the time. I further believe that the City Attorney is aware of the likely identity of this person and has been aware of this person's identity since on or before October, 2020, and has concealed that knowledge in order to proffer a lie; namely, that the report captioned "version2" is in fact authentic, did in fact exist within the City of San Diego, and that while the footnote criticizing the City

- 10 -

1 Attorney's handling of the investigation may not have been sanctioned by Elliott, it
2 nonetheless was "authentic" in the sense that it was a draft of the report prepared
3 within the investigation control group of the City of San Diego.

4     23. I further believe that discovery in this matter will reveal that despite
5 this knowledge, Elliott proffered a lie to threaten NBC7 that it was or could be the
6 subject of a criminal investigation and/or a civil suit unless it took the adverse
7 employment action against me which was in fact implemented.

8     24. I further believe that the terms of the adverse employment action taken
9 against me were tailored by Elliott to further her political aspirations; namely, to
10 prevent me from reporting further on her involvement or on any other subject
11 involving 101 Ash until after her re-election, to prevent me from exercising my
12 rights as a citizen to submit public records requests at any time on any subject,
13 which has nothing to do with my employment with NBC and has only to do with
14 political benefits applicable to Elliott and the City of San Diego. Further I believe
15 that the public humiliation of me was designed by Elliott for her own political
16 purposes and otherwise to benefit the City of San Diego with regard to matters
17 outside my employment, including to dissuade other reporters whom Elliott wanted
18 to silence during the final push of her campaign and to intimidate whistleblowers
19 whom she knew had to have come from within the investigation control group. In
20 short, I believe my reputation was destroyed as a tool for the Defendants to
21 accomplish political goals having nothing do with my reporting and that the depths
22 of this deception cannot be revealed without the power of civil discovery process
23 allowable in this legal matter.

HARGROVE DECLARATION IN SUPPORT OF
OPPOSITION TO MOTION TO DISMISS

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 8th day of November, 2021, in San Diego, California.

—DocuSigned by:
*Dorian Hargrove*
—4389DECD44B4474

Dorian Hargrove

HARGROVE DECLARATION IN SUPPORT OF
OPPOSITION TO MOTION TO DISMISS